## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Richard K. Rose,

       Plaintiff,

                                   Case No.: 2:10-cv-874

-v-                                   JUDGE SMITH

                                   Magistrate Judge King

State Farm Fire & Casualty Co.,

       Defendant.

### OPINION AND ORDER

      This matter is before the Court on the parties' cross-motions for summary judgment as to Plaintiff Richard K. Rose's claims against Defendant State Farm Fire & Casualty Company for breach of contract and denying benefits in bad faith (Docs. 53 and 57). These motions are fully briefed and ripe for review. For the following reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.

### I.      Background

      This diversity action arises from Defendant's denial of insurance benefits following a fire at Plaintiff's property. Defendant issued a Homeowner's Insurance Policy to Plaintiff, effective June 13, 2008, to June 13, 2009 (the "Homeowner's Policy"). The Homeowner's Policy insured Plaintiff's residence located at 655 Green Valley Drive, Bidwell, Ohio (the "Property"). The Homeowner's Policy provided coverage for the dwelling with a policy limit of $533,000.00, dwelling extension of $53,300.00, and coverage for personal property with a policy limit of $399,750.00. Defendant also issued a Personal Articles Policy to Plaintiff, effective October 24,

2008, through October 24, 2009.  The Personal Articles Policy provided coverage for two Rolex watches, with a coverage amount of $39,150.  The Homeowner's Policy and the Personal Articles Policy will be collectively referred to as the "Policies."

During the morning of January 7, 2009, a fire destroyed the dwelling at the Property. Plaintiff, who was the only person on the property when the fire started, testified at his deposition about the morning of the fire.  On that day, his wife left for work at her usual time, somewhere between 7:45am and 8:20am. Plaintiff remained in the home with his four dogs. As was his usual custom, Plaintiff believes he probably smoked a cigarette while drinking his coffee.  At some point, he drove his SUV down his driveway to see if his neighbor was available to talk about some work the neighbor was supposed to perform on Plaintiff's property.  The neighbor was not at his shop, and between five and ten minutes later, Plaintiff returned to his property.  While he was in the front of the property, he noticed smoke coming out of the upstairs foyer window.  Because his front door was locked, Plaintiff ran around to the unlocked backdoor where he saw smoke and flames through the double windows of his kitchen area.  Plaintiff then ran to the sliding glass door at the back of the house where his dogs were sitting, "in a state of panic." (Rose Dep. at 95).  He opened the door and let his dogs out; the oldest dog had to be pulled out from underneath the dining room table.  At this point the dogs were about twelve feet from where Plaintiff had seen flames in the window.  Shortly thereafter, the windows over the kitchen sink blew out.  Plaintiff then called 911 and placed his dogs in his truck.  He could not recall whether the dogs were covered in soot or smelled of smoke.  Plaintiff's wife testified that the dogs smelled and required baths and that one dog was seen by the veterinarian.

Within hours of the occurrence of the fire, Plaintiff reported a fire loss at the Property to

Defendant.  Defendant provided an immediate $2,500 advance payment to Plaintiff.  The next day, Defendant provided an additional advance payment of $25,000.  Plaintiff ultimately claimed losses of $696,373.30 for damage to the dwelling, $512,765.57 for damage to personal property, $30,000 for additional living expenses, and $29,850 for one Rolex watch.

The claim was assigned to one of Defendant's adjusters, Scott Harris, who initiated an investigation of the fire.  During the evening of January 7, 2009, Mr. Harris called Plaintiff's telephone number on file and left a voicemail message.  Mr. Harris also dialed a telephone number associated with Plaintiff's 26-year-old non-resident daughter, but Plaintiff's ex-wife, Kim Jividen, answered the telephone.  Ms. Jividen provided information to Mr. Harris regarding their divorce, custody and child support matters, and other financial matters concerning Plaintiff. Mr. Harris contacted Plaintiff's local insurance agent and discussed Plaintiff and the fire loss with him. A few days after the fire, Rob Raker, a Special Investigation Unit Claim Representative for Defendant, became responsible for the claim made by Plaintiff.  Mr. Raker began his investigation of the claim by visiting the Property on January 12, 2009, and talking with Plaintiff.

As part of the investigation, Defendant retained Michael Linscott, a fire investigator with SEA, Ltd., to investigate the origin and cause of the fire.  Mr. Linscott also arrived at the Property on January 12, 2009, to complete a scene inspection and a cause and origin investigation.  Mr. Linscott reviewed the exterior and interior of the Property, documenting the extensive damage to the Property.  He talked with Plaintiff to obtain any information he had about the fire.  He also examined and analyzed burn patterns to determine where the fire started.

Based on his initial investigation, Mr. Linscott decided that retaining the services of an

electrical engineer was important in determining whether an electrical problem started the fire. Consequently, Jeff Lindsey, an electrical engineer and colleague of Mr. Linscott's at SEA, Ltd., assisted in the investigation.  On January 14, 2009, Messrs. Lindsey and Linscott arrived at the Property to further investigate the fire.  Although they were unable to define a specific point of origin, they agreed that the fire generally originated around the kitchen's island and cabinetry. They removed electrical items for further examination.

On January 20, 2009, Mr. Raker took a recorded statement of Plaintiff and Shelly Rose, Plaintiff's current wife.  Mr. Raker also spoke with Plaintiff's ex-wife, Ms. Jividen, and gathered information by searching public records, such as court and real estate records.  In pursuing court documents and additional information regarding Plaintiff, Mr. Raker requested the assistance of claim test managers in West Virginia and Virginia.  Prior to having any information from his fire investigator about the cause of the fire, Mr. Raker sent an email to these claim test managers requesting that they gather information on various West Virginia and Virginia cases involving Mr. Rose, dating as far back as 1987.  (Raker Dep. Ex. D&E).  While recognizing that the cases had "some age to them," Mr. Raker noted that the information has "good impeachment value and will help establish a pattern."  (Raker Dep., Ex. D and E).

On May 18, 2009, Messrs. Linscott and Lindsey issued their "Dwelling Fire Analysis" (the "Report").  (Linscott Decl., Ex. A).  The investigators reached a number of conclusions regarding the origin and cause of the fire:

> The fire originated within an area in the kitchen that included the center island and extending north to the cabinets and the south end of the informal dining area.
>
> Examination of all electrical items known to have been in the area of origin eliminated them as being the source of ignition.

4

> Based on the statement by Mr. Rose, the insured, careless discarding of smoking materials in the trash container was eliminated as a potential source of ignition.
>
> Based upon the statements by Mr. Rose and his wife, Shelly, cooking was eliminated as being the potential cause of the fire.
>
> A non-reported human action cannot be eliminated as being causal to the ignition of this fire.
>
> The last known person to have been in the kitchen and dining area, as well as on the property before the fire, was Mr. Rose.

(*Id.* at 1).  In discussing the cause of the fire, the Report further states in part:

> The investigation analyzed all potential sources that were found in and near the area of the origin; however, the ignition source was not identified.  This includes items and activities reported by the Roses.  Clearly, the fire occurred and evolved.  Considering that Mr. Rose was the last person known to have been inside the dwelling within approximately 30 minutes of the fire's discovery, an unreported human action cannot be eliminated.

(*Id.* at 34).  The report did not ultimately make any conclusion as to the cause of the fire.

At his deposition, which was held on August 18, 2011, Mr. Linscott stated that he did not know whether the fire was an accidental or incendiary fire because he did not have evidence that it was an incendiary fire.  He further explained that, while he could identify the area where the fire originated, he could not identify the source of ignition even though "there had to be one." (Linscott Dep., at 79).  Mr. Linscott evaluated "every potential source of ignition to this fire." (*Id.* at 78).  Mr. Linscott eliminated electrical sources as a potential ignitor to the fire, and he also did not find evidence of any other possible ignition source in the fire origin area, such as a candle or a candle warmer.  Under these circumstances, Mr. Linscott resolved that "it's more probable than not that it's some human act" that caused the fire.  (*Id.* at 80).  Despite this assertion, Mr. Linscott was still unable to conclude that the fire was "incendiary." (Id).  The

5

State Fire Marshall also examined the Plaintiff's property, though no final conclusion on the cause of the fire has been made.[1]

As part of the investigation, Defendant retained attorney Timothy J. Ryan to conduct examinations under oath of Plaintiff, his wife, and his ex-wife, as well as to provide a coverage opinion. At the conclusion of the investigation, Defendant denied Plaintiff's claims for insurance proceeds. Defendant could not identify the ignition source of the fire and claimed that Plaintiff violated "Intentional Acts" and "Concealment or Fraud" conditions of the insurance policy. Further, Defendant alleged that Plaintiff neglected to use all reasonable means to preserve the property at the time of the loss.

On September 1, 2010, Plaintiff filed a complaint for money damages in the Court of Common Pleas of Gallia County, Ohio, in which he asserted causes of action against Defendant for breach of insurance contract and a tort claim of bad faith. Defendant timely removed the action to this Court based on diversity of citizenship. On December 30, 2011, the parties filed motions for summary judgment (Docs. 53 and 57). These cross-motions are briefed and ripe for disposition.

## II.     Summary Judgment Standard

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]As of August 8, 2011, the State Fire Marshall had yet to complete the investigation into the cause of the fire. (Motion to Quash Plaintiff's Subpoena, Doc. 29). However, at one point Defendant's agent stated in a report that the Fire Marshall had classified the fire as "undetermined"and classified the cause of fire as "undetermined." (Raker Dep. Ex. H).

judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street*, 886 F.2d at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.   Discussion

Both parties argue that they are entitled to summary judgment on Plaintiff's breach of contract and bad faith claims.   The Court first will address Plaintiff's breach of contract claim and then will address the bad faith claim.

### A.     Breach of Contract Claim

Plaintiff alleges that Defendant improperly failed to pay him under the Policy for his loss because no exclusion to coverage applies.  Defendant argues that Plaintiff is not entitled to

8

coverage under the Policy on two independent bases: 1) because he caused or procured the loss

to his property, and 2) because he concealed or misrepresented material facts to obtain coverage.

For the purpose of their respective summary judgment motions, the parties do not dispute

that Ohio law governs the construction or interpretation of the Policy.  An insurance policy is a

contract between the insurer and the insured.  *Pilkington N. Am., Inc. v. Travelers Cas. & Sur.*

*Co.*, 861 N.E.2d 121, 125 (Ohio 2006).  Under Ohio law, "[t]he construction of written contracts

. . . is a matter of law."  *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, paragraph one of

the syllabus (Ohio 1978).  An insurer bears the burden of proving the applicability of an

exclusion in its policy.  *Continental Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio

1980).

### 1.      Intentional Acts Exclusion

The Policies exclude loss caused or procured by intentional acts of an insured.  The

Policies both state in pertinent part:

> **Intentional Acts.**  If you [the named insured] or any person insured under this
> policy causes or procures a loss to property covered under this policy for the
> purpose of obtaining insurance benefits, then this policy is void and we will not
> pay you or any other insured for this loss.

(Doc. 54-1 at 30; Doc. 54-2 at 11).  Arson is an affirmative defense to a fire loss insurance claim.

*Attallah v. Midwestern Indem. Co.*, 551 N.E.2d 619, paragraph one of the syllabus (Ohio Ct.

App. 1988).

To prove the defense of arson, an insurer must demonstrate: (1) fire of an incendiary

origin; (2) motive on the part of the insured; and (3) opportunity of the insured to cause the fire.

*Caserta v. Allstate Ins. Co.*, 470 N.E.2d 430, 433 (Ohio Ct. App. 1983).  This defense must be

established by a preponderance of evidence that the insured caused the fire loss to obtain

insurance proceeds either by personally setting the fire or having someone else set it for him or her.  *Cody v. Allstate Indem. Co.*, No. 1:05-cv-579, 2007 WL 4460616, at *3 (S.D. Ohio, Dec. 14, 2007) (Barrett, J.) (citing *Caserta*, 470 N.E.2d at 435).  The three requirements of the arson defense may be established by either direct or circumstantial evidence.  *See Caserta*, at 435; *see also Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1249 (6th Cir. 1984) (recognizing that arson can be established in civil cases by circumstantial evidence, and that it is rarely "possible to prove the actual lighting of the match").

While Plaintiff does not contest the element of opportunity (acknowledging that he was present at the time of the fire), he states that he "will fiercely contest the element of motive." (Doc. 68 at 6).  Despite this assertion, Plaintiff does not explain his basis to contest the establishment of the motive element, which is clearly shown by the evidence of his significant financial problems at the time of the fire.  Plaintiff had no reliable source of income to meet monthly obligations of $12,500.00 in mortgage and credit card payments. (Fox Decl. 2-4 at Doc. 60).  His business ventures had sustained a cumulative loss of nearly 2 million dollars between 2005 and 2008. (Id).  He was under a judgment in favor of Fifth Third Bank and carried a $1,000,000 debt for federal taxes and a $200,000 debt for state taxes.  (Id).  In response to these facts, the Plaintiff has simply stated that he was an entrepreneur "who was no stranger to financial risk" and who "did not believe himself to be in dire financial condition at the time of the fire, despite his debt."  This bare assertion is insufficient to overcome Defendant's overwhelming evidence of Plaintiff's deteriorating financial condition. *See e.g.*,  *Smith v. State Farm Fire & Cas. Co.*, No. 2:09-cv-780, 2010 U.S. Dist. LEXIS 134346 (S.D. Ohio Dec. 20, 2010) (Plaintiff's own belief that he was not in bad financial condition was insufficient to refute

10

the insurer's evidence that plaintiff's expenses significantly exceeded his income).  Accordingly,

Defendant has amply demonstrated that Plaintiff had a motive for setting the fire. *See e.g.*,

*Rainer v. Century Surety Ins. Co.*, No. 1565, 1990 Ohio App. LEXIS 2504 (Ohio Ct. App. June

22, 1990) (pressing financial conditions a motive for setting fire to insured).

        Plaintiff also argues that there is insufficient evidence to establish that the fire was

incendiary.  An incendiary fire is a fire that is intentionally, not accidentally, set by one or more

persons.  *See, e.g.*, *Smith v. State Farm Fire & Cas. Co.*, No. 2:09-cv-780, 2010 WL 5393980, at

*4 (S.D. Ohio Dec. 10, 2010) (Abel, M.J.).  Defendant, on the other hand, argues that the

evidence sufficiently establishes that a reasonable jury could only conclude that the fire was

incendiary.  In the alternative, Defendant asserts that at the very least, a question of fact remains

as to whether the fire was incendiary.

        In support of his position that the Defendant has failed to establish that the fire was

incendiary, Plaintiff relies on fire classifications as designated by the National Fire Protection

Association (NFPA).  Plaintiff's expert, Harold Franck, P.E[2]., Defendant's expert, Michael

Linscott, and State Farm all agree that fire investigations should be governed by referring to

various guidelines published by the NFPA.  According to NFPA 921, there are only four

classifications of fire: "natural" (for example, lightning), "accidental" (for example, a piece of

malfunctioning equipment triggers the fire), "incendiary" (purposefully caused) and

"undetermined."   Mr. Franck testified that NFPA 921 states that a fire should be classified as

---

        [2]        Mr. Franck is a professional engineer who has investigated approximately 1,000
fires in his career, has presented papers relative to fire investigation, and is completing his
second book on forensic engineering, which includes a chapter on fire dynamics. (Depo 22).

undetermined when there is insufficient information to conclude that the fire falls within any of the other categories.  (Franck Dep at 46).  Mr. Franck further testified that the statement in Mr. Linscott's report that "a non-reported human action cannot be eliminated as being causal to the ignition of the fire" is not a conclusion on the cause of fire.  Specifically, Mr. Franck testified that the "fact that you can't rule out human activity doesn't mean that it's an incendiary fire.  So it still must be classified from the example I gave you as undetermined." (Id at 56).   At his deposition, Mr. Linscott asserted that he believed it was "more likely than not that something [Plaintiff] may have done is responsible for this fire," but he still could not conclude that the fire was "incendiary." (Linscott Dep at 73).

Defendant does not deny that the fire has never been classified as "incendiary." Nonetheless, Defendant argues that it has established an arson defense through circumstantial evidence.  In support, Defendant cites to *Randle v. Allstate Indemn. Co.*, 649 F. Supp. 2d 675 (N.D. Ohio 2009).  In *Randle*, the insurer denied coverage for a house fire based upon an arson defense. While the *Randle* court found that an arson defense can be premised on circumstantial evidence, is a key difference which distinguishes *Randle* from the instant case.  In *Randle,* both parties agreed that the fire was incendiary.  The defendant insurance company submitted expert reports concluding that the fire was incendiary and the plaintiff did not refute that evidence.  In the instance case, however, Plaintiff adamantly denies that the fire was incendiary and Defendant's expert report does not specifically categorize the fire as incendiary.  Even at his deposition, Defendant's expert remained unable to formally classify the fire as incendiary.  Thus, *Randle* is unhelpful to Defendant.

The Court finds better guidance in *Smith v. State Farm Cas. Co.,* No. 2:09-cv-780, 2010

12

U.S. Dist. LEXIS 134346 (S.D. Ohio Dec. 20, 2010), in which the court concluded that there was a genuine issue of material fact regarding whether a fire was of an incendiary origin.  In *Smith*, the insured sought coverage after a house fire and State Farm denied it based on an arson defense.  The insured reported that he had turned on a small space heater and then left the premises, only to later receive a phone call from a neighbor indicating that the house was on fire.  State Farm presented an expert report which concluded that there was no evidence of an electrical fire starting with the space heater. Furthermore, the report stated that because electrical fires are typically "smoldering" in nature, under the plaintiff's own time line of events, he could not reasonably have failed to notice the smoke prior to leaving the home.  Finally, the expert report stated that an "intentional human act cannot be ruled out as to the cause of this fire."  In response, the plaintiff asserted that genuine issues of material fact remained regarding the incendiary nature of the fire.  Specifically, the plaintiff asserted that there was no evidence as to the amount of time the plaintiff remained in the house after turning on the space heater and more importantly, no evidence that the fire had "smoldered" at all, thereby refuting the expert's conclusion that plaintiff would have had to notice the fire.  The plaintiff further pointed out that defendant's investigators found no evidence of accelerants and had never actually concluded that there was an incendiary origin to the fire.  Faced with these competing facts as to whether the fire was in fact incendiary, the court refused to grant summary judgment.

The Court finds that as in *Smith*, there are too many issues of material fact regarding whether the fire was incendiary, and thus, summary judgment based on the "intentional acts" clause is inappropriate.  Defendant failed to identify the origin of the fire, failed to find accelerants, and failed to offer any expert report concluding that the fire was incendiary.

13

Defendant offers its belief that Plaintiff's version of how he discovered the fire was unplausible, but that does not make it so.  A reasonable jury could conclude that Plaintiff's verison of events was plausible. The court also notes that Mr. Franck testified that he believes Mr. Linscott's determined "area of origin" was too small and therefore the investigation may have failed to identify an accidental cause for the fire. Accordingly, as the evidence is insufficient to establish that the fire was or was not incendiary, summary judgment in favor of either party on the Intentional Acts exclusion is not warranted.

### 2.    Concealment or Fraud Exclusion

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of contract claim because he made material misrepresentations in the course of Defendant's investigation. The homeowner's policy provides in pertinent part as follows:

> **Concealment or Fraud.**  This policy is void as to you [the named insured] and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

(Doc. 54-1 at 34).  The Personal Articles Policy contains a substantially equivalent provision voiding the policy if the insured intentionally conceals or misrepresents a material fact.

"[A] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented."  *Abon, Ltd. v. Transcontinental Ins. Co.*, No. 2004-CA-29, 2005 WL 1414486, at *13 (Ohio 5th Dist. Ct. App. June 16, 2005) (citation omitted).  "Most courts have construed materiality broadly, emphasizing that the subject of the misrepresentation need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer's investigation at the time."  *Id.* (citing *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 182-84(2d Cir.

14

1984).  A false sworn answer is material if it is calculated either to "discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate."  *Id.* (quoting *Fine*).

Under most circumstances, the materiality of a misrepresentation is a mixed question of law and fact that should be determined by the trier of fact.  *Id.* (citations omitted).  However, materiality "can be decided as a matter of law if reasonable minds could not differ on the question."  *Id.* (citations omitted).  Therefore, in determining the appropriateness of summary judgment, the question is whether reasonable minds could have differed as to the materiality of any alleged concealment or misrepresentation.

### a.    Rolex Watches

The first material misrepresentation asserted by Defendant relates to an initial claim Plaintiff made for loss of two Rolex watches.  Plaintiff initially told Defendant's adjuster that both of his Rolex watches were damaged beyond repair.  Then, when Plaintiff and the adjuster toured the damaged house, Plaintiff indicated that he could not find one of the watches and he was uncertain what happened to it.  Defendant's adjuster investigated the value of the watches by contacting a jeweler, who informed the adjuster that he was actually in possession of one of the watches.  The jeweler reported that Plaintiff had taken the watch to him for cleaning a few weeks before the fire.  The jeweler then apparently phoned Plaintiff to remind him that the watch was in the jeweler's possession.  Plaintiff thereafter phoned the Defendant adjuster to report that the watch had been located and that he was not claiming it after all.  The Court cannot reasonably find that a jury could only conclude that this was a material misrepresentation.  Even if a jury could find that Plaintiff knew the watch was not in his possession at the time of the fire, and thus

15

he was intentionally attempting to mislead the insurer as to the value of his personal property destroyed in the fire, that is not the only reasonable finding a jury could make based on the evidence.  A jury could just as reasonably find that Plaintiff simply forgot that the watch remained in the jeweler's possession and therefore assumed it was at his house.  Moreover, the fact that the Plaintiff immediately notified the insurer after learning that the watch was with the jeweler lends credence to this interpretation.  Therefore, because reasonable minds could differ on the question of whether Plaintiff intended to mislead Defendant with regard to the watches, this event alone cannot provide grounds for granting summary judgment on the Concealment or Fraud exclusion.

### b.     General Financial Condition

Defendant also asserts that during its investigation Plaintiff repeatedly made material misrepresentations regarding his financial condition.  More particularly, Defendant asserts that Plaintiff misrepresented: the profitability of his businesses,  the balances available in his bank accounts, the existence of multiple judgment liens against him, and the status of a financial judgment against him individually.  Plaintiff contends that none of the statements he made during the recorded statement or the Examination Under Oath (EUO) demonstrate an intent to mislead Defendant in its investigation.

### 1.     Plaintiff represented that his businesses were "profitable."

Defendant first argues that Plaintiff made a material misrepresentation when he stated at his EUO that the restaurants in which he had an ownership interest were "profitable."  (EUO at 51).  Defendant asserts this was a misrepresentation because, according to its own hired expert accountant, Plaintiff's business ventures "sustained a cumulative $1,979,680 of net operating

16

losses between 2005 and 2008, with no sign of establishing profitability." (Fox Decl. Ex. A).  In

addition, State Farm discovered multiple outstanding tax liens against Plaintiff's business

relating to employee wage withholdings that were not remitted to the proper taxing authorities.

(Raker Decl. ¶13 and Ex. D).  In response, Plaintiff argues that there is no evidence of an intent

to mislead or hide information from Defendant.  Plaintiff asserts that he answered every question

asked by Defendant about his businesses, provided all requested documentation relating to his

business dealings, and repeatedly suggested that State Farm contact his accountant to discuss the

profitability of his businesses.  (EUO at 53, 56, 58). Plaintiff further argues that his willingness

to provide all requested information to Defendant distinguishes his conduct from those cases in

which insureds were found to have made material misrepresentations.

The Court has reviewed the record regarding what Plaintiff actually testified to regarding

the profitability of his restaurants.  When asked whether any of his restaurants were profitable,

Plaintiff answered: "Yes and no . . . yes, they were profitable to the point where I could build

another store . . . on taxes, no."  (Doc. 53-2 at 51).  Plaintiff further testified that his business

"had money flowing in enough to continue to grow, according to the accountants." (EUO at 60).

Plaintiff repeatedly stated that he was not an accountant and when asked about how he was paid

and his business tax returns, Plaintiff repeatedly stated that he did not know and relied on the

advice of his accountants.  (EUO at 60).  He also repeatedly suggested that State Farm speak

with his accountant to get more accurate information.  (EUO at 58, 65, 66).  While there is

evidence that Defendant's requests to secure a telephone conversation with the accountant were

fruitless, there is no evidence as to what steps, if any, that Plaintiff took to secure his

accountant's participation, or that Defendant made any attempts to subpoena the accountant to

testify.  The Court finds that the statements Plaintiff made regarding the profitability of his businesses are not clearly misrepresentations and thus declines to grant summary judgment in favor of Defendant on this ground.

### 2.    Bank Accounts

Defendant also asserts that Plaintiff made a material misrepresentation when he testified at his EUO and Recorded Statement that he had "accounts with BB&T Bank and the Sentry Bank that totaled approximately $33,000.00 to $36,000.00.  (*See* Defendant's MSJ doc. 53 at 34).  Defendant asserts that this was a misrepresentation because, according to its financial expert, Plaintiff had much less money in his accounts at the time of the fire, and his withdrawals generally exceeded his deposits.  Plaintiff argues that any discrepancy was pure mistake and that he rectified his mis-statement about the amount in his accounts by providing all records from those financial institutions.

The Court has reviewed both the EUO and Recorded Statement and finds no such testimony regarding BB&T or Sentry Bank.  In his Recorded Statement, Plaintiff testified that he had approximately $34,000.00 in DNBT bank and another $7,000.00 to $8,000.00 in an account with Oak Hill Bank. (Recorded Statement at 38).  In his EUO, Plaintiff was asked whether he had "any other sources of income."  (EUO at 66).  He testified that he had "forty some thousand dollars sitting down here at Wachovia – whatever the name of the investment company is." (*Id*). He then stated he had "$16,000.00 over here at BB&T" and "$8,000.00 at United Bank."  (EUO p. 68).  He further stated that he had "six or $8,000, maybe even $10,000.00 at my house right now" and "$19,140...in First Century Bank." (*Id*).  The Court can find no place in the record where Plaintiff testified that he had accounts with BB&T and the Sentry Bank that totaled

18

$33,000.00 to $36,000.00.  Thus, it is unclear to the Court how this particular statement cited and relied on by Defendant can form the basis of any misrepresentation.  While Plaintiff apparently had other bank accounts and those accounts had varying amounts of money in them, Defendant does not refer to these facts.  Thus, while the evidence may in fact show that Plaintiff did not have the amounts of money in his accounts that he testified to in his EUO, Defendant has not provided evidence in support of this. Accordingly, the alleged statement that Plaintiff had "accounts with BB&T Bank and the Sentry Bank that totaled approximately $33,000.00 to $36,000.00", which statement does not appear in the record, cannot form the basis of granting summary judgment on the Concealment and Fraud exclusion.

      3.     Tax Liens and Judgments

Defendant also asserts that Plaintiff failed to identify multiple tax liens and judgments against him.  In his Recorded Statement, Plaintiff was asked: "Have there ever, have there been any judgments against you?" (Recorded Statement at 37).  In response Plaintiff stated, "Yes, Fifth Third's got one for four million dollars and they've had it for two years." (*Id*).  He then stated there was a claim against him by a vendor for $1400.00 in Galia County.  Plaintiff was specifically asked if there were any other suits in other counties or states to which questions he replied "No." (*Id*).  Defendant asserts that in truth, Plaintiff had numerous judgments against him, in not only Galia County but also other counties as well.  Defendant has submitted a print-out of numerous judgments against Plaintiff[3] which reveal hundreds of thousands of dollars worth of judgments against Richard Rose and/or his companies.  (Raker Decl. Ex. D).  In his

---

[3]State Farm employee Rob Raker avers that the print-out is a true and accurate listing of the judgments and liens State Farm uncovered against Plaintiff.

deposition, Plaintiff acknowledged the existence of the many judgments against him and further that he was in negotiations with the IRS to settle the outstanding amount against him for $100,000.00. (Rose Dep at 43).  At his deposition, Plaintiff also testified to numerous foreclosures and "charged off" credit accounts. (*Id* at 35-41).

Plaintiff has failed to respond to Defendant's evidence of the multiple tax liens and judgments against him and the fact that Plaintiff clearly failed to identify these judgments at the time of either his Recorded Statement or EUO.  Plaintiff does not suggest that he misunderstood the question against him or offer any other innocent explanation for this failure. Rather, Plaintiff argues generally that he cooperated with Defendant, providing authorizations to speak to attorneys and accountants, and to retrieve various records.  But Plaintiff's cooperation in many aspects of the investigation does not excuse his complete failure to identify substantial judgments against him. The existence of multiple tax liens and judgments is surely material to an insurer's investigation into a suspicious fire loss.  Whether or not Defendant actually relied on these representations is of no matter; under the terms of the contract, the concealment of material information voids the policy.  *See Baymon v. State Farm. Ins. Co.*, 257 Fed. Appx. 858, 862 (6th Cir. 2007).

Because the Court has concluded that the failure to identify the tax liens and judgments against him voided the policy, Plaintiff cannot maintain a breach of contract claim and therefore Summary Judgment in favor of Defendant on this claim is warranted.

### B.    Bad Faith Claim

Plaintiff alleges that Defendant acted in bad faith because it was not reasonably justified in its refusal to pay him pursuant to the Policy for his loss, and because it acted with malice in

handling his claim under the Policy. Defendant argues that it is entitled to summary judgment as to Plaintiff's bad faith claim because it was not obligated to pay under the insurance policies, and because it was reasonably justified in its decision to deny coverage.

In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under a policy of insurance. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, paragraph one of the syllabus (Ohio 1983). Those responsibilities include the handling and payment of an insured's claim. *Id.* As to whether an insurance company denied insurance coverage in bad faith, the crucial inquiry is whether "the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial," not whether the insurance company's decision to deny benefits was correct. *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992) (citing Ohio law). However, when the denial of benefits was legally correct under the terms of the applicable insurance policy, it obviously cannot be found that the insurer's denial of benefits was arbitrary or capricious, or that there did not exist a reasonable justification for the denial.

Because Plaintiff's claim for loss is not covered under the Policies, Defendant did not act in bad faith in denying the claim. Evidence that creates an issue of fact on an arson defense is sufficient, so long as it is not fraudulent, to create the reasonable justification to defeat a bad faith claim against an insurer. *Abon, Ltd. v. Transcon. Ins. Co.*, 2004-CA-0029, 2005 Ohio 3052 (Ohio Ct. App. June 16, 2005). Therefore, Defendant is entitled to summary judgment as to Plaintiff's bad faith claim.

## IV.    Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment

and **GRANTS** Defendant's Motion for Summary Judgment.

The Clerk shall remove Documents 53 and 57 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

_s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**